ARGUMENT NEXT TO NUMBER 2010-5131 ALLIED TECHNOLOGY GROUP v. United States Mr. Klobuchar, when you're ready. I am, Your Honor. Thank you very much and good morning, Your Honors. I'm going to take the issues this morning in the order presented in our briefing by talking about the contracting officer disqualifying Allied on the stated basis that Allied took six specified exceptions to the RFQ's terms and conditions. The CEO did this without giving Allied a chance to resolve that matter in discussions. The problem with this is that the RFQ was amended to address this very situation. This was a FAR Part 8.4 procurement which requires that offerors must offer goods or services they already have on a contract with the GSA's Federal Supply Schedule. All FSS offerings have standard Ts and Cs which have already been approved by the GSA and are part of the package of that offering. Now the RFQ as originally drafted and issued asked offerors to highlight or identify the differences between their standard Ts and Cs in their FSS contract and the RFQ's Ts and Cs. Allied asked for clarification about this. It wanted to know whether these differences or exceptions as the RFQ called them could put it at risk of being disqualified, especially when the draft RFQ expressly stated that the government, I'm quoting now, reserves the right not to accept any exceptions to this RFQ. DOJ then amended the RFQ. It removed that language that I just quoted and it said that the offeror would only be removed from consideration due to its standard Ts and Cs if the perceived exceptions to the RFQ's Ts and Cs, quote, cannot be resolved, close quote. After briefing, all the parties agree that this cannot be resolved language means exactly what it says in that it indicates an attempted resolution by the parties through discussions. The trial court, though, points to the general statement in the RFQ that the government, quote, intends, close quote, to make an award without discussions. And the trial court then supposedly harmonizes that provision with the cannot be resolved clause to mean that the agency had put Allied on notice that it could be disqualified without any attempt to resolve any perceived exceptions to the CO thought so significant that they require disqualification. This fails to read the RFQ provisions harmoniously or to read the RFQ as a whole. That same general clause which says the government intends. Aren't you reading the cannot be resolved? The contract from the beginning, from the initial draft straight through provided seemed to me pretty clearly that the government had the discretion if it wanted to to conduct discussions if it determined them to be necessary. That's the language that's in the contract, right? It does have that clause in it. I'm sorry. It's been quite straight throughout. So the notion is, well, and the contract said we're likely we're going to try to decide this one without discussion. That's what the contract said also, right? Yes. OK. So as a result of your inquiry, the cannot be resolved language got put in there. And as I read what you're saying is the contract's initial provision and final provision saying discussions will occur if the government wants them is a unilateral situation. Discussions only happen if the government wants them. You're saying that the cannot be resolved language converts the otherwise clear language that the discussion is a unilateral matter into a bilateral matter. That you're saying you have a right to force them to have a discussion with you. Yes, or put otherwise, Your Honor. But that if what I'm going to read is cannot be resolved is an amendment to the other clear provisions in the contract that says only the government has the right to decide if there's going to be a discussion, you may have an ambiguity. Now, given the fact that the government has the, you know, if they have the unilateral power to decide whether to have discussions, then why can't we assume that the government decided with regard to your client's deficiencies that the issue cannot be resolved? You're too far apart. No, no sense having discussions. Well, what happened here, Your Honor? Now, if that's the case, then you don't have a leg to stand on. What happened here, Your Honor, is that basically the government limited its own discretion by adding this specific clause for this situation. And so there's a conflict. The difference between bilateral authority for discussions and unilateral is day and night. There's no conflict here, Your Honor. What that clause says in the very next sentence from what you've been talking about is that the government also reserves the right. You're saying you can make the government have a discussion. And they can limit their discretion to resolve language. And it took out the clause that says that any exception causes qualification, added another clause called exceptions that says it can only be a downgrade. They were limiting their discretion, and they were basically saying, in this specific situation, it isn't our best interest to have discussion, and we will have discussions. So that reading harmonizes all the provisions. How do we know that the agency didn't decide that it didn't need to have a discussion with you? There was no sense trying to discuss with you. You're saying that the order of precedence clause in some other document governs, notwithstanding the provision in the contract that says our order of precedence clause. That is inconsistent with the way they amended the RFQ and the Hornbook law. Couldn't the government, couldn't the contracting officer reasonably say to himself, I don't need to have discussions with you. We're so far apart, we're never going to get anywhere. No, he could not under this situation, because he doesn't know if the RFQ will alter his proposal. That depends on whether or not the contracting officer has the, you know, whether the decision to conduct discussion belongs to the government alone. And it does not here. And what the law requires is that the solicitation, excuse me, the procurement be conducted in accordance with the solicitation. When a specific clause has been added in response to a specific question about this, the agency binds itself and by law must follow what it says it's going to do in the solicitation. Otherwise, under that view of the matter, the cannot be resolved clause has no meaning whatsoever. I'm sorry. My fault, excuse me. You complete your thought and then I'll move on. No, it just makes it, it's superfluous under that read. Let me ask you this, and it's getting to an aspect of the case that's discussed in another context, but it seems to me to have some at least potential application here. If the contracting officer simply said, well, all right, I don't really want to get into a lot of discussions and back and but by simply sweeping away the problems of the exceptions and then had gone to assess the two competing proposals and had chosen Monster, this issue would disappear, would it not? It would if we were not disqualified. Right. But the CO says, well, I went ahead, notwithstanding the exceptions, and I assessed the two and I came out in favor of Monster. We did collectively. Doesn't that put you in the same position with respect to this discussion issue that you would have been in my hypothetical? No, because... You understand what I'm saying? Maybe I don't. Maybe I didn't express myself clearly. In other words, the effect of what the CO seems to have said is to sweep the whole issue of exceptions off the table, seems to me, by saying even if there were no problems with the exceptions at all, I still would, we still would have picked Monster. In which case, I don't see where your discussions issue, which is directed at resolving the exceptions, gives you an argument that you were prejudiced by the absence of discussions. Well, I don't know if that's clear. Two parts to my answer. First, obviously, we attack the conducted discussions as they have been required to have done here. They also would have to have talked about any other things that they saw that were, they consider to be significant weaknesses or deficiencies, and we would have had another opportunity to have revised our proposal. So you really just don't know. But I think you and I were agreeing earlier that the one option they could have done without violating the discussions provision would be to say, we're just not going to have any objection to the exceptions. We'll just accept the bid as such. In which case, we would be in the position, it seems to me, at least setting aside the technical dispute about the technical evaluations, we would be in the position of essentially having an evaluation which ultimately came out against your client. Correct. And where's the prejudice from the lack of discussions under those circumstances? I'd have to went on the bad technical. Right. Okay. So essentially, this issue drops out and bad technical issue becomes the critical issue. Right. That's one I have to went on as well. It doesn't drop out because they did disqualify us. They should have had discussions. They would have had another chance to present offers. Can I ask you, if you're finished on this issue, can I ask you to turn to the 508 issue? Because I would say candidly that that gives me some concern. Yeah. Monster took exceptions to the 508 requirements that require internet technology to be accessible for the blind and other handicapped employees and users of the system. The Court of Federal Claims found that the exceptions that Monster took were what it called minor and gave Monster a free pass even though the agency had made no such minor finding. But even if it had, that would not do the trick under Section 508 because Congress only allows one way to get around full compliance with 508 and that's by a written finding of undue burden by the agency. The agency made no such undue burden finding here. And a court may not make that finding for the agency or decide what is minor in the circumstances that the agency finds itself in and what is not. That violates both 508 and the Chenery Rule. I want to stress that there's no basis in the record for the trial court's finding that Monster's self-confessed non-compliances are minor. Again, the agency didn't make that finding and Monster says it's Doesn't that minor point come from whoever it was that did the assessment of Monster's program? It comes from Monster's briefs principally. Yeah, but it refers to the whoever it was that examined their system to decide whether it complied. It was an independent group. The BART group, the SSB BART group. Yeah, right. And what it said was. What about the Labatt argument? I mean your client dropped the 508 ball in a major way because you didn't give a certification. Okay, let me talk about that. Let me finish, if I may, finish your initial question. Monster's consultants themselves call it their problems, their non-compliances relate to accessibility with forms, text equivalence for non-text elements, and keyboard accessibility. This procurement is all about using and manipulating forms and you do that through keyboard accessibility. And when you fill out job applications, you put in lots of non-text elements, lots of numbers. So there's no way that anyone could find this to be minor at this level. Now let's talk about Labatt. That was a situation in which the protester was uh, itself was guilty. Your point is that Labatt, you agree that Labatt would knock you out of the box here if it were on all fours. If neither side had submitted a 508 declaration, bang. If my complaint was they were not submitting a 508 certification, then yeah. One could look at it as if they supplied a certification, they supplied an independent review showing wherein they were failure with utter, their failure was not utter. Well, obviously, that's one way of looking at it. Well, that would be a wrong way of looking at it. We supplied the equivalent of the certification not just one but two occasions. Let me ask you this question. Does the effect of a certification here, and I'm talking now of course about Monster's certification of compliance, does that have the effect of converting the issue of compliance from a solicitation qualification exception, if you will, that's the way Monster described it, into a contract performance issue? That is to say, and I think you understand what I'm saying, but just to make sure we're on the same page. Yeah, in contract administration, such that if Monster, having promised that it's compliant, if it somehow falls short of compliance with the product that it ultimately produces for use, then the Department of Justice would be able to say, no, you're not living up to your compliance. No, it doesn't in these circumstances, Your Honor, because the exception sheet is not technical exception. It's really, are you taking exception to the terms and conditions? And they list these as, they're not saying, oh, we're going to fix it in 90 days or 100 days or whatever, or we're going to get there. It's saying we're never going to do it, not going to do it ever. So what is the effect of the compliance certification? Is that compliance with 508 minus our exceptions? Is that the effect of it or does it mean that there's an inconsistency between the certification and the exception? It's just a duplicative form. Monster mis-certified that they were going to comply. The page before says we're not going to comply with, here are the exceptions to our compliance. So you have to read them together. Is there anything to be, should we be concerned at all about the visuals? My understanding is that the contracting officer looked at both systems, made a visual look. So is it possible that these exceptions that you say are not minor were corrected? No, Your Honor. These are things that, there's no record evidence for that. What, what the record shows is that the contractor just messed it all together. Other than the fact that the contracting officer, who we believe acts in the ordinary course, accepted a complete certification saying I certify compliance even though the, the monster had rubbed the contracting officer's nose in the exceptions. Well, what, what happened here was that the contract officer said the monster took no exceptions. That's just clearly wrong on this record. He just missed it. What, what do you say to the, I have a second question along the same lines that we were discussing earlier. Well, perhaps slightly different. Under 1194.2b, there is, as I understand it, an obligation to purchase a commercially available system that does comply if one is available. And if one is not available, then you can back away from complete compliance in your acquisition. Or you can do an undue burden. Right. But, but even without an undue burden, you can back away from insisting on complete compliance, as I understand that, that regulation without doing the formal undue burden determination. So if the effect of Allied's submission of a bid that did not, let's assume for the moment that it effectively disqualified itself as a competing bidder by virtue of its exceptions. If the effect of that is to take Allied out of the picture as being a commercially, effectively a commercially available system to perform as, as requested, then doesn't that leave us with one bidder, which then can be accepted for less than complete compliance with 508? No, it doesn't in this situation. It might in some others, but not in this because you have an FSS offering, a government contract in which that by definition is commercially available. These are commercial items. And so, uh, AVU's FSS offering is available and, and it's conforming. I understand that argument, but what I'm saying is, you could, you could have an FSS offering. Perhaps this is hypothetical in that you're the incumbent and presumably there's, they're satisfied with, you've complied with whatever was required to be done. But at least in the abstract, you could certainly have a commercially available product, but it just doesn't happen to be the particular product that the agency wants to buy. And in that setting, the fact that it's a commercially available product is irrelevant to the inquiry here, it would seem to me. In other words, you could have a system that had a much cruder, uh, computer system, but it complied, but it's not what the agency wants. It's not what the agency is, is asking for solicitation responses. Our system meets the technical requirements. If you had a loop, Congress did not put in a loophole of meet 508 unless you don't want to meet 508 or don't want to comply or you don't want a product that doesn't comply or that does comply. I mean, it's not the way it's set up. Well, what I'm the requirements of the solicitation and therefore that that issue doesn't come up. But if you didn't, if you, if, if we should conclude that you didn't satisfy the requirements of the solicitation, then aren't you outside of the sphere that the government has to look to to determine whether there are competing products for purposes of this regulation? They still have to what sphere? The sphere, I would assume, of products that are what the government wants to buy. That meets the RFQ. It meets the statement. Right. And if your product doesn't meet the RFQ because it's disqualified by virtue of the exceptions you're taking. No, technical requirements, your honor, not terms and conditions requirements. All right. I've exceeded my time. We've, we've, uh, questioned you very heavily. Um, a final thought. Well, I have a whole final argument about the technical. What are you on the technical? Yeah. I think that's an issue that we feel pretty comfortable with. We've, we've studied the briefs closely and, and I think we're, and if you have one thought you want to focus on. If I may just have maybe a minute of rebuttal. Oh, we'll give you your full rebuttal. Open it now so they can return on the title. We're trying to give you a chance to lay this argument on the table. So Mike, make sure you talk about the technical. Okay. Well, we'll, we'll preserve your full rebuttal time. And, um, we'll hear now from, let's see, who's going to go first, Mr. O'Connell. Yes. Very well. Thank you. May it please the court. This is the case of a contractor that pursued a risky proposal strategy that simply backfired. It then sought relief. Just to be sure, uh, you're representing the government here. Yes. Yes. Co-counsel is, is Monster, correct? Yes. It's the case of a contractor that pursued a risky proposal strategy that backfired. It then sought relief from its business decisions from the GAO and the Court of Federal Claims. What the record shows is that the agency, the GAO, and the trial court gave allied the benefit of every doubt, but they all still concluded that the proper awardee was Monster Government Solutions. We understand the background that you paint for the case is a little different from the one they paint. Let's cut to the chase. What's your argument on the contract language cannot be resolved? That has to be read in light of the rest of the RFQ, which twice tells the offerors that the government intends to award without discussions. It's strictly up to the CO. So all the in cannot be resolved language means is that if the government holds discussions, then some attempt could be made to address the exceptions, but that doesn't make sense. What is the language? What meaning do you give to those three words under your interpretation of the contract? It means that if there's discussions, they can talk about and try to resolve the exceptions, um, but, but, uh, if, if they're exceptions, they can have discussions. They can. Well, no, if, if the contracting officer, for whatever reason decides to hold discussions, they can attempt to resolve the exceptions. If they don't, then they can be found unacceptable. But that language in and of itself, reading the RFQ as a whole, doesn't make those discussions mandatory. The reason why the language comes into the contract make any difference? This is the argument your adversary is making is, you know, don't, don't do a patent ambiguity thing on me guys. There was one. I went in and asked for Well, my response to that is you should do a patent ambiguity analysis because they're told that the government intends to award without discussions. It's strictly up to the CO. And what they're saying is, no, it's not strictly up to the CO. So your argument, I guess, is that if Allied comes away from the insertion of the cannot be resolved language with the insertion of, they come away thinking that they have a bilateral relationship with regard to because the actual most the language is done is to create a patent ambiguity. At most, because the government didn't remove the language that they objected to, they left it in. So that's telling in and of itself that they leave it in. But then when they also add the, the, the words in that sentence that we're not talking about, which is removed from consideration, which the draft didn't say at all. So that's the second telling fact. So how they claim to draw some comfort for the fact that we left the language in that they complained about and added language specifically telling them that they could be removed. Your argument on that is that you put the teeth in to say that you may be disqualified. That means all the more reason why you would have to have discussions. Well, it's all the more reason why you should clarify it prior to bid. That's what I would say. What's your comment on the fact that this cannot be resolved provision is under the heading part four additional documents. To what extent does that mean that this language only relates to things and not others? Well, I, I don't agree with that because that paragraph starts out by saying, by talking about the, the RFQ as a whole and the contracting officer is telling them to identify the exceptions on a separate piece of paper just so that they stick out. I don't know if you've, I'm sure you've noticed that the proposals here are several hundred pages long. So they're, just makes it easy for the contracting officer if the exceptions are on a separate page. Now, did I misunderstand you earlier as arguing that the cannot be resolved language only is triggered if there is some determination by the contracting officer that a discussion is warranted? Yes, yes. Because the, right. That, I mean, that, that's the position you're taking. Yes. But that's not what the language says. The language provides sort of, as I read it, two conditions to a determination that an offer should be removed from consideration. One, that a provision is considered unacceptable and two, that it, the, the unacceptability cannot be resolved. That has nothing to do with discussions. It's just these are the two conditions predicate to an offer being removed from consideration. But the only way that they could attempt to resolve something, an exception, is through discussions. There's simply no other way to do it. So that brings into consideration the other contract terms that provide that we intend to award without discussions and attempt, and to you only get a chance to resolve your exceptions if the contracting officer decides to hold discussions. What about the language on the contracting officer's decision at page A1132 at the top? Monster took no exceptions. Gets us into this 508 issue. Yes. And I think you have to read that in context because the other thing that's being discussed here is all the major exceptions that Allied took. Contracting officer's clearly concerned about major exceptions, but it's reasonable reading this in context to mean that he wasn't concerned about the 508 exception. What, what is about the context tells us that the word no exceptions means no major? Because it's followed by a half a page discussing all the major exceptions that Allied took, the material exceptions. Okay. It seems there's a little bit of a leap of logic there, isn't there? Well, not necessarily. I mean, keep in mind, please, a couple of other things. First of all, there's 114 functional, technical, and security requirements that the contractors have to certify that they can meet under this proposal. So the contracting officer doesn't have the resources to go out and validate whether the contractors can do these. So he has to be able to rely upon the representations from the contractors. And if he can rely on the representations from the contractors, it follows that he can also rely upon their representation and certification that the exception is minor. What the court said when faced with a comparable argument in the Axiom case is that the court noted that the contractor is subject to various remedies under the contract. In addition, I would point out that there's also a host of extra contractual remedies that the government has, some of which can be very harsh. So there's a strong incentive on the part of a contractor not to exaggerate and not to misrepresent because very bad things can happen if it does. So as a result, because of the contractual and statutory framework, the contracting officer can rely upon these. And then if it turns out that the contractor misrepresented, then it can be dealt with as part of contract administration. Well now, has Munster, in your view, pursuant to its bid, has it undertaken to be fully 508 compliant with the designated exceptions? Well, all I can tell you is they've been performing for a year. Tell me what you think the contract means. Well, under 508, there's a rule of reason. As it's already been pointed out, the government isn't required to pay top dollar to get the most compliant system and isn't required if people don't bid on the contracts. Is this the undue burden? This is both undue burden and the other exception that provides that the government can, in certain cases, award to a less than fully compliant, you know, based upon the marketplace that was discussed earlier. But that's if there is no other available candidate in the marketplace. Isn't that what the regulation says? Can I discuss them both in tandem if you don't mind the undue burden and the other one? I mean, reading those together, there's a rule of reason under this statute. We don't have to pay top dollar, which this case is a perfect example of for the most compliant exception, for the most compliant product. The statute says we don't have to award to the more expensive company if it would be an undue burden. The regulations define undue burden as a significant expense, which is a very low threshold for the government to make. The contracting officers already found here that the price difference between the two companies is overwhelming. And just the plain English language meaning of overwhelming means to overcome completely, to overpower. So it's clear that under what the contracting officers already said that we meet that test, number one. But number two, given the price difference that's set forth in the briefs and the decisions, I mean, considering prejudice, it's just inconceivable that in the current fiscal environment that any contracting officer in the government would find this price difference to be insignificant. Now, the undue burden, as I understand it, typically requires that you go through a particular sequence of analytical steps. Right. That wasn't done in this case, I take it. Other than the statement about it being overwhelming that I said, he didn't make any kind of written finding, but that's why I'm asking you to consider it under prejudice that's required under the case law. Right. Now, we don't want to run your co-counsel a lot of time here, so why don't you go ahead and make whatever further point you would like to make that I want to make sure and reserve some time for your co-counsel. Sure. Let me just finish up by saying that prejudice here is very important, not only for the reasons I've already said, but the case is squarely governed by the court's holdings in, the court's opinions in Data General and BANM. Just like in Data General here, we have no representation either at the GAO or the Court of Federal Claims that the price would be lowered enough to compete effectively with And under BANM, there's nothing more than a theoretical possibility that the scores would change significantly if the case were rebanded. Despite all of Allied's complaints about the scoring, it's a couple decimal points from receiving the highest score, excellent. It simply can't go up that much. What it needed to show under BANM was that Monster's score would drop precipitously. As I said, 114 requirements here. When this case started at the GAO, Allied was contending literally that Monster couldn't meet dozens of the requirements under the RFQ. They've dropped almost every one of those arguments, so they're effectively conceding that Monster can meet 112 of the 114 requirements. And even the two that it's complaining about still, the social security numbers in 508, the complaints go more towards the technical acceptability of the product rather than the quality of the product that would be judged under the technical evaluation. Can I ask you one more question? And I'm violating my own injunction against extending the time, but if I understood, I'm not sure where this comes from, but somewhere in the record I got the department side of the system, not on the applicant side of the system. Is that right or am I, oh, perhaps you don't know. Well, perhaps you. I don't recall that. If you don't know, perhaps your co-client counsel will be able to address that question, but I thought I saw it somewhere. In any event, let's hear from your co-counsel. Thank you and ask that the court affirm the trial court. Mr. Morehouse, we are going to be giving your opposing counsel some extra time, so we will not limit you to the remaining time. Thank you very much, Your Honor. Good morning and may it please the court. I would like to address the 508 issue, if I may, from Monster's perspective. I'm a little disturbed in hearing some of the statements by counsel for Allied in its argument using terms such as Monster was not compliant or took exception or mis-certified that it was compliant. It had an independent VPAT consultant looked at its system and found that it was generally compliant with certain minor exceptions, which it indicated, and that is precisely what Monster reported to the government. The certification, though, was not qualified. It was certification of compliance. During contract performance, Your Honor? Yes. Well, this is, counsel for Allied has taken a contract formation proposal evaluation issue out of the 508 compliance when it really is a performance contract administration issue. So, you think then, let me repeat the same question I asked from your opposing counsel, you think then that the certification by Monster of compliance in the administration of the contract binds Monster to complete compliance with 508, not to compliance minus the non-complying exception portion of Monster's performance. Is that correct? It is compliance to the extent, and as I believe the question was just asked, is compliance as directed by the agency or as directed by the statute, and we say it is as directed by the agency because it says that each federal department of agency shall ensure, and it is a matter of contract administration, what they shall ensure. There is nothing in that statute that says that minor exceptions are not permitted. In fact, the GAO in its court-smart decision said there can be varying levels of compliance with 508, and it is up to an agency to make the determination which offer best meets those requirements consistent with price and other considerations. There is no absolute rule. In fact, if I may make the point, and I believe it is known as the Delaney Clause, that the law does not engage in trifles where a statute does not expressly say we will not permit de minimis exceptions. De minimis exceptions are allowed in interpreting that statute. How do we know the exceptions here were de minimis? We know that they were minor because that is... How do we know that the word minor is used apparently by S.S. Bart Group? Yes. How do we know that Bart Group knows what's minor or major in the business of verifying compliance with 508, and Monster hid nothing under the... No light under the bushel on this one. They got an independent third party. I would submit, we would assume that S.S. Bart knows what it means by minor. Well, suppose that... Hypothetically, suppose that S.S. Bart to at least comply to the extent that anybody who has a disability other than blindness, let's say, can use this thing perfectly well. There aren't that many blind people, particularly blind people who apply for jobs at the Department of Justice, let's say, and therefore it's minor, even though a blind person would have a complete incapacity to deal with the system. Would that be minor? No, I don't think there's anything that indicates there is any failing of the system to allow blind people to use it. You may have, for example... I thought that was in the nature of the system was there wasn't a screen accessibility that would be necessary for a blind person to use that. I think in one or two instances. I think, for example, is the analogy that we've used. They have to be a textual or speaking representation of an image, a non-textual image. You may have, I don't know how many screens of text or how many lines of computer information, and I'm only a layperson, that in a few instances you might have, for example, a picture of a rabbit, if I may, and there is not a... On that particular image, the system doesn't say to a blind person, orally, picture of rabbit, or something in braille that would say you're looking at a picture of a rabbit. Of course, the problem with your position, it seems to me, is maybe it's not insuperable, but the problem is that the contracting officer didn't say this exception is sufficiently minor that it's de minimis. It's not something that should influence our decision to qualify. The contracting officer said there were no exceptions, and right into the category of the part five exceptions in about, I don't know, 24-point type is this exception. So, it's hard to say that the contracting officer did all the analysis that you've just gone through and came to the conclusion that it was really okay. Well, I want to respond to that because I'm looking at A1132, and it is true, and as you asked Mr. O'Connell on, it says Monster took no exceptions. Now, I don't mean to mince words, but I think the word took is important. It is not that Monster said, I know that I have to comply with X, Y, and Z, and I refuse to comply. They didn't say that. They said, here are the findings of our independent consultant. They laid it out. They were asked a question, are you compliant or not? They signed the certification, we are compliant. It was a yes or no answer, but they wanted to be fair to the government. They wanted to make sure that they laid it out for the government. They said, these are the minor exceptions. So, I think it is fair to say we're talking about a passive exception. We've looked at your system as it stands today, Monster, and there are a few things that do not meet full compliance. You're taking the position that the verb took means something other than that they voiced or articulated or set forth? Or actively took it, exactly, as a statement of non-compliance. As the rules of a bid acceptability or proposal, bid responsiveness or proposal acceptability run, there is a difference between indicating that there may be an exception. There may be an exception which the contract allows us to fix as a matter of performance versus I refuse to Did you have any other point you wanted to touch on? Yes, I did. I did want to touch on the issue of Allied's failure to submit the signed certification. The RFQ was absolutely clear that the off-roar had to submit a signed certification. Allied never submitted a signed compliant certification. They have never articulated the reasons why they did not submit that signed certification. They have said passingly in their briefs it was inadvertent. There has been no explanation why it was inadvertent. So, under the settled law that they themselves cite in the Firth construction and Oxbow cases, there is no signed statement by an Allied officer that they will comply with 508 versus Monster that says we will comply with 508. Didn't they state they were in compliance? They stated yes, but that was a yes or no. And a yes or no is not the same thing as a signed certification. Punishable under 18 U.S.C. 1001 though, isn't it? Well, I suppose if we went that far, but in the very Firth construction case, which with all due respect I believe they substitute for the failure to sign a bid package with a signature of the off-roar. Now, there are certain exceptions if you can prove that the officer of the company signing the bid bond was authorized as well to sign the bid. There is no signature by an Allied officer that they will comply with 508. And I think that clearly brings us under the rubric of LeBanon. Okay. Thank you, Mr. Morehouse. We will hear a rebuttal from Mr. Clayton. Thank you, Your Honor. Thank you, Your Honor. I'm going to resist other comments. I just want to talk about the prejudice point that Mr. O'Connell made. Of course, this gets to the technical evaluation in particular. After finding several errors, several types of errors in the technical evaluation, the trial court then went on to say, but I find no prejudice. I just want to tell you briefly why that was wrong. Technical was substantially more important than price in this best evaluation analysis, excuse me, best value analysis. And the CEO's finding that Allied had only a slight technical advantage was central to his source selection decision. As he found that the large price difference overcame Allied's technical advantage because that advantage was only what he called very slight. He even put it into 5.04 percent. Okay. So, the decision collapses if his slight technical advantage finding was arbitrary and capricious. The Court of Federal Claims held that it was not arbitrary and capricious. Well, you just can't come to that conclusion when the CEO's decision is based on significantly flawed, uneven-handed technical evaluations and arithmetic averaging without substantive analysis. In this situation, the determination that only slight technical superiority, that determination is by definition arbitrary and capricious and wrong as a matter of law. Now, that being the agency to allow it to perform a proper best value analysis. The rationale of Alpha Laval and Impreza, which I cite in our briefs, is that when matters will be returned to the agency for another round of discussions, proposals, and then reevaluation for an award decision, no one knows how the offerors might change their proposals. So, an incumbent like Allied is clearly prejudiced. The Weeks Marine case that DOJ cited in their brief actually supports us because it has the same controlling rationale and they're in a pre-award situation where they don't need to show a significant likelihood or, excuse me, substantial because it says there aren't, it recognizes there aren't any offerors or award decisions yet. And when you send it back down for new proposals, a new award decision, you're basically in a pre-award situation. Let me ask you a question on that. And I don't know the answer to this, but I'm sure you do. Does, when you remand a case like this, suppose we were to remand because we found a problem with, let's say, this issue. Do you remand for a complete do-over or do you remand or can you ask the agency to simply reassess the bids that were before it at the time and make a new evaluation of those bids as opposed to requiring a whole new proposal? Well, either option is available depending on the circumstances. Here, it's going to have to be a whole new... Who gets to choose? What? I'm sorry? Who gets to choose which option? Well... Do we get to choose? No, but in a situation where we've been improperly disqualified, where there haven't been discussions, as soon as there are discussions, by law, it's required that it opens up the whole thing and they have to be new proposals and a new round of, uh... You're still having to answer my question. I mean, Judge Bryson is asking, you know, what, what happens? You say, well, sometimes there's a complete do-over and sometimes they just reassess the record that was in front of the CIO. I'm sorry, let me try again. When, when discussions are required, then it requires by law... Who decides when, who decides when discussions are required? Well, the court hopefully will decide that that's exactly what is required here. If we were to decide that you're not right on the discussions issue, but you're right on a couple of the other issues, one option would be to say, we don't see this as, as necessitating a complete re-procurement. It's conceivable, although it's, it's a decision that would then go back to the contracting agency to decide whether or not they wanted to reopen or not. I see. But that, that is something that ultimately would be typically left to the agency to make a determination between those two choices. Right, unless, unless both were disqualified and had to start over or... Understood. So, the last point I'd make is that Allied makes an even stronger case on the showing on the record than Alpha Laval did in this case and Impreza did in this case. I'd like you to take a look one more time at the bar charts. Those are the various ratings. These are the various ratings by the evaluators. In the extremes, two of the evaluators had 30 percent better for Allied, one had 25 percent better for Monster, and what the CO did was just average them all out to come with a slight technical superiority. So, Allied is the incumbent here. They're clearly prejudiced and I appreciate your attention this morning. Thank you. We thank all counsel. Case is submitted.